**MEMPHIS TRANSIT COMPANY**

v.

**UNITED STATES.**

No. 355–57.

United States Court of Claims.
Dec. 6, 1961.
Rehearing Denied March 7, 1962.

The taxpayer corporation is engaged primarily in the operation of a motor bus and trackless trolley system in the City of Memphis, Tennessee. Prior to 1945, taxpayer operated an electric street railway system in Memphis, but this operation was abandoned in 1945, 1946, and 1947. As a result of this abandonment the taxpayer incurred an obvious loss. The Internal Revenue Service recognized that a loss occurred and allowed abandonment losses for the years 1945, 1946, and 1947. There is no dispute as to the method used in determining the amount of the loss recognized, but there exists a dispute as to the amount. The basis for the dispute is the difference of opinion as to the cost of taxpayer's property as of December 31, 1912. The defendant contends that this cost was $9,843,000, which is equivalent to $9,343,000 of plaintiff's bonds outstanding, plus $500,-000 in cash originally paid on common stock when the company was organized. The plaintiff contends that this amount should be increased by the 1905 fair market value of 25,000 shares of its common stock which it is claimed was paid on December 18, 1905 as part consideration for the acquisition of property received by it from the Memphis Street Railway Extension Company (hereinafter sometimes referred to as the Extension Company). Therefore, other factors being constant, an increase in the cost of the plaintiff's property would naturally result in a greater loss when that property was abandoned. It would, in addition, increase taxpayer's equity invested capital which is a figure used in determining excess profits.

To resolve this dispute, we must determine whether plaintiff issued the 25,000 shares of stock as part consideration for property received by it.

In February of 1905 the Extension Company received a franchise to operate and maintain a street railway system over certain streets in Memphis. The lines were to be extensions of the plaintiff's then existing lines. The Extension Company maintained its own corporate minutes, stock certificate books and books

Frank Norton Kern, New York City, for plaintiff, E. Roy Gilpin, New York City, and Arthur E. Devlin, St. Louis, Mo., on the brief.

Harold S. Larsen, Washington, D. C., with whom was Asst. Atty. Gen. Louis F. Oberdorfer, for defendant, James P. Garland, Lyle M. Turner, Philip R. Miller and J. Mitchell Reese, Jr., Washington, D. C., on the brief.

LARAMORE, Judge.

This is a suit for refund of income and excess profits taxes for the years 1943, 1944, and 1947.

of account. The Extension Company held directors' meetings, purchased materials and borrowed money. As of December 18, 1905, it had assets of $700,000. However, as of that date the Extension Company had realized no receipts from operations. On that date 495 shares of the Extension Company's 500 shares outstanding were held by Isidore Newman & Sons. Similarly, of plaintiff's 5,000 shares outstanding, 4,989 shares were held by the same Isidore Newman & Sons. On December 18, 1905, the Extension Company entered into a contract with plaintiff whereby it agreed to sell to plaintiff all its property. The purchase price agreed upon was 25,000 shares of plaintiff's common stock (par value of $2,500,000) and $700,000 in five percent gold bonds. Before entering into the contract, plaintiff had no outstanding preferred stock and only 5,000 shares of common stock. Plaintiff's stockholders on December 18, 1905, authorized 25,000 shares of preferred stock to be given to the holders of the old common stock and that the old common stock be retired. They further authorized the issuance of 25,000 shares of new common stock which was to be given to the Extension Company. It is the transfer of this stock that gives rise to the principal part of the present controversy.

The first overall question presented by this case is: Did the taxpayer acquire property for its stock in an arm's length transaction in 1905, when it paid $700,000 in bonds for property of Memphis Street Railway Extension Company, having a tangible value of no more than $700,000, and in addition issued 25,000 shares of common stock having a par value of $2,500,000 to an affiliate or alter ego of the person owning approximately 99 percent of its stock?

The resolution of two legal questions depends on the answer to the first overall question: (1) whether the taxpayer's equity invested capital should be greater than that allowed by the Commissioner of Internal Revenue in computing taxpayer's excess profits tax for the period April 1, 1943 to December 31, 1943, and for the calendar year 1944; (2) whether taxpayer sustained a greater loss than allowed by the Commissioner of Internal Revenue as a result of the abandonment of its street railway lines in 1945, 1946, and 1947.

The solution of the first overall question lies in the facts of this case. The evidence shows, and the commissioner has found, which finding we adopt, that no satisfactory evidence is presented that the 25,000 shares of plaintiff's common stock issued to the Extension Company were truly a part of the consideration for the assets acquired by plaintiff through an indenture and conveyance by the Extension Company to the plaintiff dated December 18, 1905 (finding 26).

This court said in Republic Steel Corp. v. United States, 159 F.Supp. 366, 369, 141 Ct.Cl. 499, 503:

"* * * However, the declared purpose of the parties is not necessarily controlling. Of more significance is what the parties actually did. Thus, substance, and not form, governs in this type of controversy. Weiss v. Stearn, 265 U.S. 242, 44 S.Ct. 490, 68 L.Ed. 1001."

Therefore, this court will not permit the corporate image to serve as blinders when it seeks to answer the question as to what actually occurred here, but will look at the facts in each situation. The pertinent facts in the instant case may be summarized as follows:

The stockholders were the same. The taxpayer had never established an evaluation of its franchise on its own books, and there is no evidence that the plaintiff had established or determined any value for the franchise acquired from the Extension Company on December 18, 1905. There is no evidence that plaintiff's earnings were sufficiently increased after the acquisition of the additional franchise and other assets of the Extension Company whereby a reasonable determination of value of such franchise might be made. The Extension Company had not fully developed its franchise and had never operated any part of it, nor is there evidence that the Extension

Company ever intended to operate its franchise or that it could have operated profitably, except as an adjunct to plaintiff's system. Therefore, the plaintiff has totally failed to sustain its burden to prove the value that could be reasonably ascribed to the franchise in excess of $700,000. Finally, the facts show that the $700,000 of five percent bonds issued by plaintiff as of October 18, 1905, represented the fair and reasonable net value of all the assets acquired by the plaintiff from the Extension Company, and that no consideration can be reasonably attributable to the 25,000 shares of its common stock as a part of the consideration of such assets, as set forth in the proposed agreement of December 18, 1905 by the Extension Company.

In short, the two corporations were owned by the same interest. The $700,000 of improvements to taxpayer's lines were transferred to taxpayer when completed, and in the course of this transfer 25,000 shares of taxpayer's common stock were issued to Isidore Newman & Sons.

It follows as a necessary result of our determination that the plaintiff's equity invested capital should not be increased by any value ascribed to the 25,000 shares of common stock and that taxpayer did not sustain a loss greater than that allowed by the Commissioner of Internal Revenue. This is so because both parties agree as to the method of computation and the total cost of plaintiff's tangible property, leaving as the only dispute the question as to whether the value of the 25,000 shares should be added to plaintiff's cost on December 31, 1912. Since we hold that the value of the 25,000 shares should not be added to plaintiff's cost, it follows that the cost attributable to intangibles as determined by the Commissioner was correct.

In the light of the facts above recited, but one conclusion can be reached—that taxpayer's equity invested capital used in computing its excess profits tax and taxpayer's obsolescence loss were correctly computed by the Commissioner of Internal Revenue.[1] Consequently, plaintiff cannot recover on this item of its claim.

■ The second and final question presented involves plaintiff's claim that its earnings and profits as of the close of the years 1943 and 1944 should be recomputed so as to reflect the income and excess profits tax liabilities found to be owing by plaintiff for these years. This, plaintiff asserts, should be done by taking into account the effect upon such liabilities of the adjustment which would be applicable to these years by applying the net operating loss and unused excess profits credit carrybacks for the years 1945 and 1946. The result of this would be an increase in accumulated earnings and profits existing at the beginning of 1944 and 1945, which in turn would increase the excess profits credits for 1944 and 1945, thus reducing the adjusted excess profits net income subject to tax for these years.

Despite an Internal Revenue ruling[2] which expressly bars such a result, plaintiff seeks such an adjustment on the general rule that with regard to earnings and profits the amount thereof should reflect the corporation's true financial condition as of the end of the taxable year, regardless of whether or not all of the events and determinations have occurred at that time. Plaintiff cites several cases, principally Stern Brothers & Co., 16 T.C. 295 (1951), which have applied this rule. However, the cases cited dealt with disputed tax liabilities which arose for the very year for which the earnings and profits were sought to be recomputed and none involved the situation here; i. e., of applying to prior years tax consequences which arose in subsequent years.

Defendant relies on the Supreme Court decision in Lewyt Corporation v. Commissioner, 349 U.S. 237, 75 S.Ct. 736, 99 L.Ed. 1029 (1955) in opposition to plaintiff's claim. There it was held that for the purpose of computing a net operating loss carryback from 1946 to 1944 and hence to 1945, the excess profits tax deductible for 1944 was such excess prof-

1. See finding 17.

2. Rev.Rul. 55–28, 1955–1 Cum.Bull. 359.

its tax as computed without giving effect to the allowance of the net operating loss carryback. Plaintiff seeks to distinguish that holding from the situation here on the ground that what was involved in Lewyt was the computation of a net operating loss carryback rather than the computation of earnings and profits, and that since the latter are basic to the determination of the real financial condition of a corporation they must be computed with regard to events and determinations which occur in subsequent years.

However, as pointed out above, the theory which plaintiff seeks to apply and the cases relied on in support thereof deal with situations or events which arose prior to or at the close of the taxable year in question, with only the settlement of the dispute which they gave rise to being determined in a subsequent year. This, of course, is not the situation here where the adjustment or carryback which is sought to be applied is dependent upon facts which relate not to the taxable year but some later year.

The adjustment which plaintiff urges here is, of course, not in conformity with the general rule of tax reporting when the taxpayer is on the accrual method. The holding of the Stern Brothers case, supra, and the cases which have followed it are recognized as providing an exception to this general rule. The exception in the Stern Brothers case, supra, is applicable where it is conceivable that the full tax could have been determined and paid in the taxable year. This would be impossible in the case at bar. Plaintiff has received the benefit intended by the net operating loss and unused excess profits credit carrybacks. Such a further extension as plaintiff requests is barred by the Internal Revenue ruling cited above and we believe would be contra to the rationale of the Lewyt decision, supra.

Plaintiff is not entitled to recover, and its petition will be dismissed.

It is so ordered.

JONES, Chief Judge, and DURFEE and WHITAKER, Judges, concur.